IN RE ESTATE OF ADALINE MOWREY.

FIDELITY & CASUALTY COMPANY of New York, Appellant, v.
J. E. HULL, Administrator de bonis non, Appellee.

No. 42307.

JUNE 23, 1934.

REHEARING DENIED NOVEMBER 22, 1934.

McNett, Kuhns & Brown, for appellant.

George L. Gillies and Merrill C. Gilmore, for appellee.

EVANS, J.— We find the most difficult feature of this case is to make a concise and intelligible statement of it. The record is full of complications and considerable irrelevancy. A brief résumé of fifteen years of history is requisite in order to enable an understanding of the culminating controversy.

The testatrix was Adaline Mowrey, who died testate in December, 1916, leaving an estate of approximately $70,000. The beneficiaries of the will were a few collateral relatives and several charitable institutions, the latter taking the larger part of the estate. John F. Webber and Walter A. Lewis were named as executors in the will. They were the controlling officers of the Wapello County Savings Bank of Ottumwa. The will provided that in case of the refusal (or death) of either nominee to serve as executor, the Wapello County Savings Bank should serve in his stead. Webber and Lewis were both appointed and both qualified. They bought a surety bond from the claimant herein for $80,000, on which bond each executor became a principal. On April 1, 1919, Lewis died. Thereupon proceedings were begun to substitute the Wapello County Savings Bank as joint executor with Webber. Arrangements were made with the same surety company for a $60,000 bond. The undoubted intent of the parties at that time was to substitute the $60,000 bond for the $80,000 bond. Their proceedings were irregular and desultory; so much so that they actually forgot what they had done and what they had failed to do. For several years following, they proceeded as though they had done what they intended to do and had accomplished the substitution of the $60,000 bond for the $80,000 bond. The executors signed an application for the

$60,000 bond and received such bond. No order of the court was ever obtained authorizing or approving such bond. Such bond was never filed. From that time on they paid their annual premium upon this $60,000 bond. The surety company presented its statement of account for the annual premium upon the $60,000 bond, and no more. At no time after September 15, 1919, did the local agent of the surety company or its home office, ever claim any annual premium upon the $80,000 bond, nor was any application made at any time for a discharge of the $80,000 bond or exoneration of its suretyship. The result was that both the executors and the surety company purported to act under a bond that had no legal existence, and purported also to act as though the $80,000 bond had been fully exonerated and discharged. Not only did the $60,000 bond have no legal existence, the very paper upon which it was written was physically lost. There was no record of it and no one knew where it could be found. It was later found somewhere accidentally and picked up like a horseshoe, without its benediction, more than nine or ten years after its execution by the surety company. On April 7, 1928, Webber died. At the time of his death, and for many years prior thereto, he was the president of the Wapello County Savings Bank. In November, 1930, his executrix filed for him a purported final report in this estate over which considerable controversy resulted. The hearing of the final report disclosed a defalcation on the part of Webber, as executor, to the amount in round numbers of $32,000. In that hearing the executor of Webber took the position that only the $60,000 bond was in force, and that it had been taken as a substitute for the $80,000 bond. It was at that hearing that the facts, which we have already stated, were disclosed. The court necessarily held that the $80,000 bond had never been discharged or exonerated; and that the $60,000 bond had never been approved by the court or presented for approval at any time. If the defalcation of the executor had been in excess of the face of the $60,000 bond it will be seen that the disclosures at this point might have involved serious consequences. But the sum of $32,000 measured the defalcation and it was well within the penalty of either bond. The court entered judgment upon the $80,000 bond. Perhaps it ought to be said that in a formal sense it entered judgment upon both bonds. The order was entered on November 10, 1930. The surety company submitted thereto and paid the same in full and became thereby fully exon-

erated. Fifteen days later the surety company filed the present claim for annual premiums earned for a period of twelve years on the $80,000 bond. It takes the plausible ground that if it is to be held on the $80,000 bond then it is entitled to the annual premiums which it would have been entitled to collect from the executor during the years of its dormancy. The result of compliance with its claim would be to charge the estate with liability for the premiums on two bonds when only one was necessary. The blame for such a muddled situation rested solely upon the executor.

As a basis for its claim against the estate, as such, instead of against the executor, the claimant relies upon section 12764, Code. This is as follows:

"12764. The premium for any such guaranty or surety company bond as defined in section 12763, may, by the approval of the court, be paid out of the trust funds in the hands of the party of whom the bond is required."

The claimant had never demanded from the executor during his life, nor from his executrix after his death, the payment of these premiums. The order appealed from interposed of itself no obstacle to the recovery by the surety from the estate of the executor, if it was entitled to recover at all. The claimant encounters at this point the question whether section 12764 is mandatory upon the court to allow such premiums to be charged against the estate. This question must be answered in the negative. In clear terms the statute imposes a discretion upon the court. Section 12065, Code, which deals specifically with the extraordinary expenses in the settlement of an estate provides:

"12065. Such further allowances as are just and reasonable may be made by the court to administrators, executors, and their attorneys for actual necessary and extraordinary expenses or services."

In this case the court held in substance that this extraordinary expense resulted through the fault and failure of the executor, who was primarily liable for the expense; that the penalties of such a blunder were not just and reasonable as a charge against the estate. In so holding, we think the court was clearly within the discretion conferred upon it by the statute.

It may be observed at this point that the payment of this amount would increase the defalcation of Webber by the amount of this

claim. By the settlement made November 10, 1930, the defalcation was fixed at $32,000, for which the surety was liable. The estate of Webber was insolvent. The amount of the defalcation was fixed without any reference to the present claim of this claimant. If it had made a timely presentation of its claim and if the same had been allowed, the defalcation would be $34,000 instead of $32,000, and such would be the amount of liability of the surety company. It is clear, therefore, that whether the claim of plaintiff was chargeable against the estate primarily, or against Webber primarily, it would have increased the amount of Webber's defalcation to its own extent. Whatever sum, therefore, the claimant would take as premium, it would have to pay back as a surety for the defalcation. The distinguished counsel anticipate this argument with the counter contention that the settlement of November 10, 1930, and the payment of the defalcation then found, became a complete adjudication as to the surety, and could not be later increased by the discovery of additional claims. If the order of November, 1930, is a complete adjudication as against the estate, it is as complete an adjudication as against the claimant. The primary liability for the premium was on the executor. It was for the court to say upon final hearing whether allowances for the payment of premium should be made. The appropriate time for such determination was at the hearing of the final report. The failure of the claimant to bring forward its claim might well operate as a proper influence upon the court to exercise his discretion adversely to the later allowance of the claim as against the estate. By withholding its claim until after the discharge of the executor and his estate, the claimant rendered itself unable to collect from the executor. If the estate were to be deemed primarily liable rather than secondarily, then the same conduct of the claimant put it out of the power of the estate to recoup the payment from the estate of Webber. It should be noted here that in 1919 a hearing was had in the probate court wherein it was found that the function of the executors had been performed and that the estate should be closed and turned over to the ultimate trustee by the 1st of January, 1920. In view of this previous finding, the court below confirmed same and held that the keeping open of the estate for the ten or twelve years succeeding, was a breach of duty on the part of the executors for which the surety was responsible.

The accrual of premiums from two bonds after the necessity for the bonds had expired was merely an accrual of damage to

some one. Webber was responsible for the breach of duty resulting in the damage. The resulting damage fell upon him in the first instance. The court held that liability for the premiums accruing after January 1, 1920, could not reasonably be charged to the estate. It allowed the claimant the premiums which accrued up to January 1, 1920. This gave the claimant a recovery of $86. It denied allowance for any accruals of premium thereafter. Such order was clearly within its discretion. The exercise of the discretion was fair and reasonable.

We think the order should be affirmed.

All Justices concur.